CORRESP 1 filename1.htm



**VIA EDGAR**

June 27, 2017

Jennifer Monick
Assistant Chief Accountant
Office of Real Estate and Commodities
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-6010

    **Re:  Welltower Inc.**
        **Form 10-K for the fiscal year ended December 31, 2016**
        **Filed February 22, 2017**
        **File No. 001-08923**

        **Form 8-K**
        **Filed February 22, 2017**
        **File No. 001-08923**

Dear Ms. Monick:

The purpose of this letter is to respond to the comments raised in your letter addressed to Welltower Inc. (the "Company") dated June 5, 2017. Our response to each comment is set forth below and, as indicated below, a disclosure will be included in future periodic filings, amendments and updates thereto or future proxy statements, as the case may be.

Form 10-K for the fiscal year ended December 31, 2016

Notes to Consolidated Financial Statements

General

1.   We note your response to our prior comment 2 and that you have determined disclosure of the terms and amounts of the various management agreements with Sunrise is not necessary. We refer you to your disclosure in your Form 10-K which states that your relationship with Sunrise accounted for 23% of your total revenues for the year ended December 31, 2016. In light of the significance of your relationship with Sunrise, please confirm that you will disclose your percentage ownership interest in Sunrise and the terms and amounts of your management agreements with Sunrise in future periodic filings. This information should be disclosed for each of the periods for which income statements are presented. Please refer to ASC 850-10-50.

---

June 27, 2017
Page  2

RESPONSE:

Beginning with our Annual Reports on Form 10-K for the year ended December 31, 2017, we will add disclosure in our Notes to Consolidated Financial Statements to describe our related party transactions with Sunrise similar to the following:

> As of December 31, 2016, we owned 24% of Sunrise Senior Living Management, Inc. ("Sunrise"). Sunrise provides comprehensive property management and accounting services with respect to certain of our seniors housing operating properties that Sunrise operates, for which we pay annual management fees pursuant to long-term management agreements. Our management agreements with Sunrise have initial terms expiring between January 2018 and April 2032 plus, if applicable, optional renewal periods ranging from an additional five to 15 years depending upon the property. The management fees payable to Sunrise under the management agreements include a fee based on a percentage of revenues generated by the applicable properties plus, if applicable, positive or negative adjustments based on specified performance targets. For the years ended December 31, 2016, 2015 and 2014, we recognized fees to Sunrise of $37.8 million, $36.4 million, and $37.5 million, respectively, the majority of which are reflected within property operating expenses in our Consolidated Statements of Comprehensive Income.

<div align="center">* * *</div>

We hope you will find the foregoing responsive to your comments. If you have any questions regarding any of the above, please do not hesitate to call Paul D. Nungester, Senior Vice President & Controller of the Company, or the undersigned, Scott A. Estes, at 419-247-2800. Thank you very much.

Very truly yours,
Welltower Inc.

By:   /s/ Scott A. Estes
Name: Scott A. Estes
Title: Executive Vice President – Chief Financial Officer

cc:   Paul D. Nungester, Senior Vice President & Controller, Welltower Inc.
      Matthew McQueen, Senior Vice President – General Counsel & Corporate Secretary, Welltower Inc.
      Zachary Madden, Esq., Shumaker, Loop & Kendrick, LLP

CORRESP 1 filename1.htm



**VIA EDGAR**

May 26, 2017

Jennifer Monick
Assistant Chief Accountant
Office of Real Estate and Commodities
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-6010

    **Re:  Welltower Inc.**
          **Form 10-K for the fiscal year ended December 31, 2016**
          **Filed February 22, 2017**
          **File No. 001-08923**

          **Form 8-K**
          **Filed February 22, 2017**
          **File No. 001-08923**

Dear Ms. Monick:

The purpose of this letter is to respond to the comments raised in your letter addressed to Welltower Inc. (the "Company") dated May 12, 2017. Our response to each comment is set forth below and, as indicated below, a disclosure will be included in future periodic filings, amendments and updates thereto or future proxy statements, as the case may be.

Form 10-K for the fiscal year ended December 31, 2016

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Non-GAAP Financial Measures

NOI Reconciliation, page 59

1. We note your response to our prior comment 3. Please note the presentation of the total segment profit or loss measure in any context other than the ASC 280 required reconciliation in the footnote is considered a presentation of a non-GAAP financial measure. In future filings, please revise your NOI reconciliation to comply with the requirements of Item 10(e)(1)(i)(B) of Regulation S-K. Please refer to Question 104.04 of the updated Compliance and Disclosure Interpretations issued on May 17, 2016.

---

May 26, 2017
Page 2

RESPONSE:

In future Exchange Act filings, earnings releases and supplements beginning with the three months ended June 30, 2017, we will revise our NOI reconciliations to comply with the requirements of Item 10(e)(1)(i)(B) of Regulation S-K to reconcile to net income.

Notes to Consolidated Financial Statements

General

2. We note your response to our prior comment 4 and your conclusion that Sunrise Senior Living is a related party due to your minority share equity ownership in Sunrise Senior Living. Please explain to us in greater detail how you determined that you do not have any material related party transactions with respect to your relationship with Sunrise Senior Living that would trigger disclosure requirements under Item 4-08(k) of Regulation S-X or ASC 850-10-50. Your response should address, but not necessarily be limited to, how you determined it was unnecessary to disclose (1) the transaction in which you acquired an equity interest in Sunrise Senior Living, (2) your percentage ownership interest in Sunrise Senior Living, and (3) the terms of the management agreement with Sunrise Senior Living. Also, your response should address how you determined it was unnecessary to disclose transactions with Sunrise Senior Living on the face of your financial statements, including, but not limited to, management fee consideration.

RESPONSE:

We have previously disclosed information regarding our relationship with the Sunrise Senior Living management company ("Sunrise") in prior filings around the time of the relevant transactions. On January 9, 2013, we completed our merger and acquisition of Sunrise Senior Living, Inc., including a portfolio of properties and a 20% ownership interest in Sunrise (collectively the "Sunrise Merger"). We disclosed the Sunrise Merger, including our 20% ownership interest in Sunrise, in each of the three Quarterly Reports on Form 10-Q and the Annual Report on Form 10-K for the year ended December 31, 2013. In April 2014, we acquired an additional 4% ownership interest in Sunrise and we disclosed this in our Quarterly Report on Form 10-Q for the three months ended June 30, 2014. We have continued to own 24% of Sunrise as of our most recent filings. We will disclose any increase or decrease in our ownership interest in Sunrise in Exchange Act filings covering the period in which such increase or decrease occurs.

We are party with Sunrise to various management agreements pursuant to which Sunrise manages certain of our facilities for a management fee. We determined it was not necessary to disclose the terms or amounts related to these related party transactions with Sunrise based on our evaluation of materiality considerations. We evaluate the management fees paid to and our investment in Sunrise based on a variety of metrics. For the year ended December 31, 2016, our fees paid to Sunrise pursuant to the various management agreements, which are based on a percentage of revenues generated by the properties under management, represented approximately 2% of our total property operating expenses, 1% of our total expenses, 3.5% of our net income and 2.4% of our FFO attributable to common stockholders and our investment in Sunrise represented less than 0.1% of our total assets as of December 31, 2016. We determined that such amounts were not material to warrant disclosure on the face of the financial statements or in the footnotes. We continuously evaluate the management fees paid to Sunrise and will provide disclosure in future Exchange Act filings if such fees become material.

---

May 26, 2017
Page 3

Form 8-K filed February 22, 2017

Exhibit 99.1

FFO Reconciliation, page 10

SSNOI and REVPOR Reconciliations, page 11

3.  We note your response to our prior comment 7 and that your response and revisions only address a portion of our comment; as such, we partially reissue our comment. We note the adjustments line item to arrive at SHO same store revenues. Please revise your disclosure in future filings to provide disaggregated information for these adjustments. This comment also applies to the presentation on page 27 of exhibit 99.2.

RESPONSE:

In future earnings releases and supplements beginning with the three months ended June 30, 2017, we will revise the referenced reconciliations to disaggregate the adjustments line item to arrive at SHO same store revenues.

\*     \*     \*

We hope you will find the foregoing responsive to your comments. If you have any questions regarding any of the above, please do not hesitate to call Paul D. Nungester, Senior Vice President & Controller of the Company, or the undersigned, Scott A. Estes, at 419-247-2800. Thank you very much.

<div style="text-align:right">

Very truly yours,
Welltower Inc.

By: /s/ Scott A. Estes
Name: Scott A. Estes
Title: Executive Vice President – Chief Financial Officer

</div>

cc: Paul D. Nungester, Senior Vice President & Controller, Welltower Inc.
    Matthew McQueen, Senior Vice President – General Counsel & Corporate Secretary, Welltower Inc.
    Mary Ellen Pisanelli, Esq., Shumaker, Loop & Kendrick, LLP

CORRESP 1 filename1.htm



**VIA EDGAR**

April 28, 2017

Jennifer Monick
Assistant Chief Accountant
Office of Real Estate and Commodities
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-6010

    Re:  **Welltower Inc.**
          **Form 10-K for the fiscal year ended December 31, 2016**
          **Filed February 22, 2017**
          **File No. 001-08923**

          **Form 8-K**
          **Filed February 22, 2017**
          **File No. 001-08923**

Dear Ms. Monick:

The purpose of this letter is to respond to the comments raised in your letter addressed to Welltower Inc. (the "Company") dated April 3, 2017. Our response to each comment is set forth below and, as indicated below, a disclosure will be included in future periodic filings, amendments and updates thereto or future proxy statements, as the case may be.

Form 10-K for the fiscal year ended December 31, 2016

Item 1. Business, page 2

1. We note from your disclosures that your relationships with Genesis, Sunrise, and Revera, by virtue of its status as an affiliate of Sunrise, each accounted for ten percent or more of your total revenues in either fiscal year ended December 31, 2016 or December 31, 2015. Please tell us and revise your disclosure in future Exchange Act reports to fully describe your relationships with Genesis, Sunrise, and Revera, including any equity ownership in, real estate loans issued to, or joint ventures entered into with such entities. Please refer to Item 101(c)(1)(vii) of Regulation S-K.

RESPONSE:

The FASB ASC Master Glossary and the guidance in ASC 606 defines customer as "A party that has contracted with an entity to obtain goods or services that are an output of the entity's ordinary

---

April 28, 2017
Page 2

activities in exchange for consideration." We concluded that Genesis is a customer but operating partners like Sunrise and Revera are not. As discussed in our Annual Report on Form 10-K for the year ended December 31,

2016, we have three main business lines (or operating segments). In Triple-Net, we own properties that are leased to tenants who are our customers and who operate the properties for their benefit. In Outpatient Medical, we own properties that we self-operate for our benefit and in which we lease space to tenants who are our customers. In Seniors Housing Operating, we own properties that involve individual residents who are our customers and where we engage eligible independent contractors to manage the properties on our behalf. Our Seniors Housing Operating portfolio involves relationships with multiple entities whom we contract with to obtain property management services that are an output of their ordinary activities in exchange for management fee consideration. We consider ourselves to be the customers and our property managers to be vendors in these relationships rather than vice versa. As such, we do not believe that the disclosure requirements of Item 101(c)(1)(vii) of Regulation S-K apply to our Seniors Housing Operating manager vendors but it does apply to our Triple-Net and Outpatient Medical tenants and Seniors Housing Operating residents. We acknowledge that Genesis was a significant customer relationship. We believe that our Genesis relationship is described in various sections of the Annual Report on Form 10-K for the year ended December 31, 2016. However, in future Annual Reports on Form 10-K beginning with the year ended December 31, 2017, we will add disclosure to describe relationships related to certain significant customer concentrations as exemplified by the following for Genesis.

*Genesis Healthcare*. As of December 31, 2016, our relationship with Genesis was comprised of a master lease for 85 properties owned 100% by us, four real estate loans totaling approximately $317 million, approximately 6.6 million shares of GEN Series A common stock (representing approximately 4.25% of total GEN common stock) and a 25% ownership stake in an unconsolidated joint venture that includes a master lease for 28 properties operated by Genesis.

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Key Performance Indicators, Trends and Uncertainties, page 43

2.  We note your presentation of net debt to book capitalization ratio, net debt to undepreciated book capitalization ratio, and net debt to market capitalization ratio. Please revise future filings to include a reconciliation of the inputs into these ratios. Please refer to Item 10(e) of Regulation S-K.

RESPONSE:

In future Exchange Act filings beginning with our Form 10-Q for the three months ended March 31, 2017, we will include a reconciliation showing the inputs of the three capitalization ratios mentioned above.

---

April 28, 2017
Page 3

Non-GAAP Financial Measures

NOI Reconciliation, page 59

3.  In future filings, please revise your NOI reconciliation to comply with Item 10(e)(1)(i)(B) of Regulation S-K which requires a reconciliation of non-GAAP financial measures disclosed or released with the most directly comparable GAAP measure (i.e. net income). Further, your reconciliation should begin with the GAAP measure, so the non-GAAP measures do not receive undue prominence. Please refer to Question 102.10 of the updated Compliance and Disclosure Interpretations issued on May 17, 2016. This comment should also be applied to your presentation of NOI within your supplemental information.

RESPONSE:

Based on Item 10(e) of Regulation S-K and Regulation G, we must reconcile non-GAAP financial measures to the most directly comparable financial measure calculated and presented in accordance with GAAP. Although the Staff's Comment suggests that Net Income is the most directly comparable GAAP financial measure, we believe it

to instead be Net Operating Income From Continuing Operations ("NOICO") as presented in Note 17 of our Annual Report on Form 10-K for the year ended December 31, 2016. The adopting release for Regulation G states: i) "Non-GAAP financial measures will not include financial measures that are required to be disclosed by GAAP..."; ii) "…non-GAAP financial measures do not include…measures that are calculated using exclusively…financial measures calculated in accordance with GAAP…" and iii) "…measures to which Regulation G does not apply include…measures of profit or loss and total assets for each segment required to be disclosed in accordance with GAAP." NOICO represents our measure of segment profit and is required to be disclosed per ASC 280 (points i and iii) and it is calculated as GAAP Revenues minus GAAP Property Operating Expenses (point ii). Thus, NOICO does not meet the definition of a non-GAAP financial measure but rather is a GAAP financial measure pursuant to ASC 280. Therefore, in future Exchange Act filings and earnings releases and supplements beginning with the three months ended March 31, 2017, we will ensure all relevant reconciliations start with NOICO.

Notes to Consolidated Financial Statements

General

4. Based on news reports, it appears you acquired an equity interest in Sunrise Senior Living during 2014. In addition, based on your DEF 14A filed March 24, 2017, it appears that your CEO is on the board of Benchmark Senior Living. Please clarify for us if you determined that Sunrise and Benchmark are related parties and tell us how you made that determination. To the extent you determined that Sunrise and Benchmark are related parties, please tell us how you have complied with the financial statement presentation requirements of Item 4-08(k) of Regulation S-X and the disclosure requirements of ASC 850-10-50.

RESPONSE:

Based on the definition of "related party" in the FASB ASC Master Glossary and the guidance in ASC 850-10-20, we concluded that our CEO's position on the board of advisors of Benchmark Senior Living does not make Benchmark Senior Living a related party. Benchmark Senior

April 28, 2017
Page 4

Living's board is not a board of managers. Our CEO's position on Benchmark Senior Living's board of advisors does not give him (or us) the ability to significantly influence Benchmark Senior Living's management or operating policies as the role of its board of advisors is solely advisory and Benchmark Senior Living's management has no obligation to follow any advice given by its board of advisors. Additionally, none of the other items in the guidance are met for Benchmark. Based on the aforementioned definition and guidance, we concluded that Sunrise Senior Living is a related party due to our minority share equity ownership in Sunrise Senior Living, which is accounted for under the equity method of accounting. However, we do not believe we have any material related party transactions to disclose under the requirements of Item 4-08(k) of Regulation S-X or ASC 850-10-50.

17. Segment Reporting, page 92

5. We note you present three reportable segments in your financial statement footnotes. We further note you have presented information for four divisions in your Form 8-K filed February 22, 2017. Please clarify for us if you have three or four reportable segments and tell us how you made this determination. Please refer to ASC 280.

RESPONSE:

We have identified three operating segments: Triple-Net, Seniors Housing Operating and Outpatient Medical, which are also reportable segments. While we do provide certain separated information for the Triple-Net operating segment's underlying predominant property types in our earnings supplements furnished via Form 8-K, we do not believe that these groupings meet the criteria in ASC 280-10 to be considered operating segments on their own. We

do not separately manage the components of the Triple-Net segment but rather manage the properties as one segment for purposes of assessing performance and allocating resources. Individual properties often contain multiple unit types (i.e., both seniors housing and long-term/post-acute), so we classify properties based on their predominant unit mix, and they can change over time as unit mix changes. Additionally, a significant majority of our Triple-Net investments are structured as master leases that represent one lease covering multiple properties, including different property types, with a single tenant, which makes it necessary to manage the properties within the segment collectively. Information such as occupancy and facility revenue mix that we provide in our earnings supplements, represents information attributable to our tenants, not us, and we provide certain allocated information like NOI to help provide context to our investors and analysts in understanding the relative contribution of our property mix within the operating segment. However, we manage the Triple-Net portfolio as a whole rather than by individual components of property types and thus have concluded that it represents one operating segment and have three reportable segments when combined with Senior Housing Operating and Outpatient Medical.

---

April 28, 2017
Page 5

Form 8-K filed February 22, 2017

Exhibit 99.1

FFO Reconciliation, page 10

6. In arriving at Funds from operations-NAREIT, you start with net income (loss) attributable to common stockholders and make an adjustment for noncontrolling interests. As a result, it appears Funds from operations - NAREIT and ultimately Normalized FFO, are attributable to common stockholders. Please clarify and/or revise the labeling of your non-GAAP financial measures in future earnings releases.

RESPONSE:

In future earnings releases beginning with the three months ended March 31, 2017, we will re-title "FFO" to "FFO attributable to common stockholders" for both NAREIT and Normalized uses.

SSNOI and REVPOR Reconciliations, page 11

7. We note the pro rata adjustments line item to arrive at pro rata NOI and SHO pro rata revenues and the adjustments line item to arrive at SHO same store revenues. Please revise in future filings to provided disaggregated information for these adjustments. This comment also applies to the presentation on page 27 of exhibit 99.2.

RESPONSE:

In future earnings releases and supplements beginning with the three months ended March 31, 2017, we will revise the referenced reconciliations to disaggregate the pro rata adjustments into the components of unconsolidated and noncontrolling.

Exhibit 99.2

Debt Maturities and Principal Payments, page 23

8. We note your presentation of pro rata secured debt. Please revise future filings to provide the components of your pro rata secured debt.

RESPONSE:

In future earnings supplements beginning with the three months ended March 31, 2017, we will revise our presentation of secured debt to disaggregate into the components of consolidated, unconsolidated and noncontrolling.

\* \* \*

April 28, 2017
Page 6

We hope you will find the foregoing responsive to your comments. If you have any questions regarding any of the above, please do not hesitate to call Paul D. Nungester, Senior Vice President & Controller of the Company, or the undersigned, Scott A. Estes, at 419-247-2800. Thank you very much.

Very truly yours,

Welltower Inc.

By: /s/ Scott A. Estes
Name: Scott A. Estes
Title: Executive Vice President – Chief Financial Officer

cc: Paul D. Nungester, Senior Vice President & Controller, Welltower Inc.
    Matthew McQueen, Senior Vice President – General Counsel & Corporate Secretary, Welltower Inc.
    Mary Ellen Pisanelli, Esq., Shumaker, Loop & Kendrick, LLP

CORRESP 1 filename1.htm



**VIA EDGAR**

May 13, 2016

Jennifer Monick  
Assistant Chief Accountant  
Office of Real Estate & Commodities  
United States Securities & Exchange Commission  
100 F Street, NE  
Washington, DC 20549-6010

Howard Efron  
Staff Accountant  
Division of Corporation Finance  
United States Securities & Exchange Commission  
100 F Street, NE  
Washington, DC 20549-6010

**Re:  Welltower Inc.**
    Form 10-K for the fiscal year ended December 31, 2015  
    Filed February 18, 2016  
    File No. 1-08923

Dear Ms. Monick and Mr. Efron:

The purpose of this letter is to respond to the comments raised in your letter addressed to Welltower Inc. (the "Company") dated May 3, 2016. Our response to each comment is set forth below and, as indicated below, a disclosure will be included in future periodic filings, amendments and updates thereto or future proxy statements, as the case may be.

Form 10-K for the fiscal year ended December 31, 2015

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Non-GAAP Financial Measures, page 65 to 66

1. In arriving at Funds from operations, you start with Net income attributable to common stockholders. As a result, it appears Funds from operations is actually Funds from operations attributable to common stockholders instead of all equity stockholders. In future periodic filings please re-title "FFO" to the more appropriate "FFO attributable to common stockholders".

RESPONSE:

In future periodic reports beginning with the three months ended June 30, 2016, we will re-title "FFO" to "FFO attributable to common stockholders".

---

May 13, 2016  
Page 2

Notes to Consolidated Financial Statements

2. Accounting Policies and Related Matters

Investment in Unconsolidated Entities, page 80

2. Please tell us your basis in U.S. GAAP for recording your investments in unconsolidated entities based on estimated fair value of the assets prior to sale of interests in the entity.

RESPONSE:

In accordance with ASC 323-10-30-2 we measure our investment in an unconsolidated investee initially at cost including transaction costs as indicated in ASC 805-50-30. The disclosure referred to above reflects our policy to recognize a retained investment in an entity as a result of a deconsolidation transaction at fair value in accordance with ASC 323-10-30-2 and ASC 810-10-40-3A through 40-5. We have entered into no such transactions during the periods presented in the Form 10-K filed February 18, 2016. In future periodic reports beginning with the year ended December 31, 2016, we will revise our policy disclosure to state the following: "The initial carrying value of investments in unconsolidated entities is based on the amount paid to purchase the entity interest inclusive of transaction costs."

7. Investments in Unconsolidated Entities, page 89

3. Please clarify for us why appreciation of the underlying properties and transaction costs will result in a basis difference of your joint venture investments. Within your response please reference the authoritative accounting literature management relied upon.

RESPONSE:

In accordance with ASC 323-10-30-2 we measure our investment in an unconsolidated investee initially at cost including transaction costs as indicated in ASC 805-50-30. We believe that such cost is reflective of the fair value of our share of the underlying net assets which typically consist of properties. Accordingly, a basis difference is created between the amount for which we purchase our interest in the entity and the historical carrying value of the net assets of the underlying entity. In accordance with ASC 323-10-35-13, a difference between the cost of an investment and the amount of the underlying equity in net assets of an investee shall be accounted for as if the investee were a consolidated subsidiary. In accordance with ASC 323-10-35-13, this excess is allocated to real property owned and depreciated over the estimated useful life of the property. Similarly because transaction costs are included in our initial investment but not in the underlying net assets of the entity a similar basis difference is created.

---

May 13, 2016
Page 3

16. Disclosure about Fair Value of Financial Instruments

Items Measured at Fair Value on a Recurring Basis, page 99

4. We note your disclosure of the $58 million gain related to your option to acquire an ownership interest in Genesis Healthcare. Please tell us how you calculate this gain upon the merger event in February 2015 between Genesis Healthcare and Skilled Healthcare Group. Additionally, tell us when your option to acquire an ownership in Genesis Healthcare was net settled and what was received in such settlement. Further, please tell us how you accounted for this derivative asset prior to February 2015; in this regard, please address how you valued this derivative asset and where you recorded it. Within your response, please reference the authoritative accounting literature management relied upon.

RESPONSE:

In conjunction with the transaction with Genesis HealthCare Corporation on April 1, 2011, FC-GEN Operations Investment, LLC ("Genesis") was spun off prior to the transaction, and we received an option to purchase up to a 9.9% equity interest in Genesis ("Option") exercisable anytime from the second anniversary of the effective date (April 1, 2011) through April 1, 2026 and upon the occurrence of certain events. The Option was able to be

exercised in whole with an option price of $47,000,000. We analyzed the Option received at the time noting that the underlying shares were not readily convertible to cash and the circumstances which could have allowed for net share settlement were contingent upon future events and not within our control. Until February 2, 2015 the only manner in which we could have settled the Option was through a physical settlement of cash in exchange for shares. Based on a review of qualitative and quantitative factors (including a third party valuation of Genesis), we concluded that there was no value to the Option.

On February 2, 2015 Genesis closed on a transaction to merge with Skilled Healthcare Group ("Skilled") and through the merger Genesis became a publicly traded company on the NYSE. At this time the Option was marked to fair value through the income statement in accordance with ASC 815-10-35-2. Note that we exercised our option simultaneous with the closing of the Genesis and Skilled merger by net settling the Option position which resulted in us receiving 6,564,576 shares of Genesis stock. Note that this amount is net of 4,446,479 shares which represented the revised Option price of $39,575,000 (the Option price was reduced from $47,000,000 to $39,575,000 as a result of transaction entered into by Genesis in which they used assets of the company to buyout an equity holder). The net number of shares received was based on the 10 day average Skilled stock price of $8.90030 and the same price was used to determine the value of the net 6,564,576 shares received resulting in a mark to market adjustment on the derivative of $58,427,000.

<div align="center">* * *</div>

---

May 13, 2016
Page 4

In connection with responding to your comments, the Company hereby acknowledges that:

- the Company is responsible for the adequacy and accuracy of the disclosure in the filings;
- staff comments or changes to disclosure in response to staff comments do not foreclose the Commission from taking any action with respect to the filings; and
- the Company may not assert staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

We hope you will find the foregoing responsive to your comments. If you have any questions regarding any of the above, please do not hesitate to call Paul D. Nungester, Senior Vice President and Controller of the Company, or the undersigned, Scott A. Estes, at 419-247-2800. Thank you very much.

<div style="margin-left: 50%;">
Very truly yours,<br>
Welltower Inc.<br><br>
By: /s/ Scott A. Estes<br>
    Scott A. Estes<br>
Its: Executive Vice President and<br>
     Chief Financial Officer
</div>

cc: Paul D. Nungester, Jr., Senior Vice President & Controller, Welltower Inc.
    Matthew McQueen, Senior Vice President – Legal, Welltower Inc.
    Mary Ellen Pisanelli, Esq. Shumaker, Loop & Kendrick, LLP